UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

JEROME MANNING,

              Plaintiff,

         v.

SWEDISH MEDICAL CENTER, et al.,

              Defendants.

CASE NO. C15-0949JLR

ORDER ON MOTION TO AMEND COMPLAINT AND MOTION FOR SUMMARY JUDGMENT

## I.   INTRODUCTION

Before the court are Plaintiff Jerome Manning's motion to amend his complaint to add a breach of contract claim (Mot. to Amend (Dkt. # 31)) and Defendant Swedish Medical Center's ("Swedish") motion for summary judgment on Mr. Manning's Title VII race discrimination claims (MSJ (Dkt. # 33)).  The court has reviewed the motions, the parties' responses, the parties' replies in support of their respective motions, other relevant portions of the record, and the applicable law.

ORDER- 1

Considering itself fully advised,[1] the court GRANTS Swedish's motion for summary

judgment and DENIES Mr. Manning's motion to amend for the reasons set forth below.

## II.    BACKGROUND

This case arises from an employment relationship between Mr. Manning[2] and

Swedish.  (*See generally* Compl. (Dkt. # 4).)  Swedish hired Mr. Manning in 2008 as a

material distribution technician ("MDT"), a position that required Mr. Manning to

restock and distribute supplies to surgical departments at Swedish's First Hill campus.

(Berntsen Decl. (Dkt. # 34) ¶ 3, Ex. A ("Manning Dep.") at 9:25-10:19.)  A collective

bargaining agreement ("the CBA") between Swedish and SEIU 1199NW ("the Union")

governed Mr. Manning's and the other MDTs' employment conditions.  (*See* Brown

Decl. (Dkt. # 35) ¶ 6.)

### A.    Discipline Prior to the Employment Dispute

Before the events Mr. Manning alleges amount to race discrimination, in 2009,

2010, and 2011, Mr. Manning received verbal and written warnings for failing to follow

Swedish's Dependability Policy, which Swedish also refers to as its "no call/no show

policy."  (Manning Dep. at 46:18-47:22; Brown Decl. ¶¶ 7-9, Exs. A, B, D; MSJ Resp.

---

[1] Neither party requested oral argument, and the court finds that oral argument would not be helpful to the court's disposition of the motions.  *See* Local Rules W.D. Wash. LCR 7(b)(4) ("Unless otherwise ordered by the court, all motions will be decided by the court without oral argument.").

[2] Mr. Manning is proceeding *pro se* and *in forma pauperis* ("IFP") in this matter.  (*See* Dkt.; IFP Order (Dkt. # 3).)

(Dkt. # 44), Ex. B.)[3]  Under Swedish's Dependability Policy, employees are expected to "work their assigned schedule, being present and punctual."  (Brown Decl. ¶ 9, Ex. C ("Dependability Policy").)  Swedish tracks both "absenteeism" and "tardiness" under the Policy, and the Policy states that supervisors should "address" "excessive absenteeism or tardiness."  (*Id.* at 2-4.)  The Dependability Policy further states that Swedish considers employees who fail to show up for work three days in a row without notifying their supervisors to have voluntarily resigned their positions.  (*Id.* at 1, 3.)  Mr. Manning's supervisors reviewed this Policy with him when he received the warnings.  (Manning Dep. at 47:13-15, 48:18-23.)

## B.    Department Restructure

In early 2012, Swedish began restructuring the Material Distribution Center at its First Hill campus, where Mr. Manning worked.  (Harper Decl. (Dkt. # 37) ¶ 3.)  As part of the restructure, Swedish required the MDTs to get a sterile processing certification no later than December 31, 2012.[4]  (*Id.*)  To become certified, the MDTs had to take a sterile processing certification test.  (*Id.*)  In the months before the certification deadline,

---

[3] Under Federal Rule of Evidence 901, a proponent of evidence must authenticate the evidence.  *See* Fed. R. Evid. 901(a).  To do so, "the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is."  *Id.*  Mr. Manning has not presented the court with evidence to authenticate his exhibits.  (*See* MSJ Resp.; Dkt.)  However, the court will consider Mr. Manning's exhibits on this motion for summary judgment because several of Mr. Manning's exhibits are identical to those that Swedish has offered and authenticated on its motion for summary judgment, Swedish has not objected to the authenticity of Mr. Manning's exhibits, and Mr. Manning is proceeding *pro se*.

[4] The Union agreed to the sterile processing certification requirement.  (Harper Decl. ¶ 3.)

ORDER- 3

1   Swedish reminded the MDTs of the new requirement and the deadline for meeting it

2   multiple times.  (*Id.* ¶¶ 6-8, Exs., A, B, C.)

3       To help the MDTs prepare for the certification test, Swedish and the Union jointly

4   offered two classes to all of the MDTs.  (*Id.* ¶ 4.)  If the MDTs elected to take the course,

5   Swedish paid them for half of their time during the course.  (*Id.*)  Swedish and the Union

6   agreed that if an MDT did not successfully obtain the Sterile Processing Certification by

7   the required date, the MDT could elect one of two options under the CBA.  (*Id.* ¶ 8, Ex.

8   C.)  The MDT could choose to (1) be laid off with severance pay or (2) become a

9   displaced employee who would receive preference for an open position at Swedish for

10  which the MDT was qualified.  (*Id.*)

11      At the time that Swedish announced the new certification requirement, it

12  employed nine MDTs in the Materials Distribution Center.  (*Id.* ¶ 4.)  Of the nine MDTs,

13  six MDTs took the preparation course and passed the certification test, one MDT

14  resigned before the certification deadline, and two MDTs—Mr. Manning and Marcus

15  Collins—failed the test.  (*Id.* ¶¶ 4-5, 9.)  Mr. Manning did not attend the preparation

16  sessions, deciding instead to "challenge" the test by taking it without studying.  (Manning

17  Dep. at 20:23-21:1 ("I didn't take any prep classes."); Harper Decl. ¶ 5.)

18  **C.   Displacement**

19      On January 1, 2013, Mr. Manning opted to become a displaced employee.  (Brown

20  Decl. ¶ 11.)  To obtain new employment at Swedish, Swedish required Mr. Manning to

21  interview for an open position.  (*See* Marshall Decl. (Dkt. # 36) ¶ 3.)  At that time,

22  "Swedish [had] posted four openings for an MDT position at the First Hill campus in the

Materials Service Center ("MSC")." (*Id.*; Brown Decl. ¶ 12.)  These MDT positions did

not require the sterile processing certification.  (Brown Decl. ¶ 12.)  Mr. Manning and

approximately 167 other people applied for those four positions.  (*Id.*)  After conducting

panel interviews with multiple applicants, including Mr. Manning, Swedish chose not to

hire Mr. Manning for any of the open positions for which he applied.  (*Id.* ¶ 4.)  The

interviewers declined to hire Mr. Manning because they determined that he "had very

limited experience with the materials management system used in the MSC," falsely

represented some of his experience, and lacked motivation.  (*Id.* ¶¶ 3-4.)  For the four

positions, Swedish hired people who self-identified as African American,

Hawaiian/Pacific Islander, two or more races, and white.  (*Id.*)

On January 31, 2013, Mr. Manning filed a grievance with Swedish through the

Union about Swedish's decision not to rehire him.  (Manning Dep. at 25:12-16, 31;

Brown Decl. ¶ 13, Ex. E.)  Specifically, Mr. Manning grieved Swedish's decision not to

"automatically place him in one of the vacant MDT positions" without requiring him to

interview for the position, which Mr. Manning contended violated the CBA.  (*See*

Marshall Decl. ¶ 5.)

**D.    Reinstatement**

Several months later, in July 2013, Swedish granted Mr. Manning's grievance and

reinstated him to a position in a department that did not require Mr. Manning to have the

sterile processing certification.  (Manning Dep. at 121:2-16; Brown Decl. ¶ 14.)  Mr.

Manning accepted Swedish's offer of reinstatement, which included back pay and

retroactive benefits (*see* Manning Dep. at 121:2-16), but he asked some clarifying

questions about his work schedule (Brown Decl. ¶ 15; *see also* Resp. to MSJ, Ex. J).[5]

For example, Mr. Manning wanted to know if he could switch to the day shift and

confirm that he would be working Monday through Friday as he had before his

displacement. (Resp. to MSJ, Ex. J at 1.)  The Union responded to Mr. Manning that

Swedish's Rian Brown had stated Mr. Manning would work the night shift from Monday

through Friday. (Resp. to MSJ, Ex. K at 1.)  Mr. Manning returned to work—this time in

the MSC—in August 2013. (*See* Brown Decl. ¶ 8.)

However, after he was reinstated, Mr. Manning opposed the rotating weekend

shifts that Swedish also assigned him. (Manning Dep. at 126:19-127:5.)  He believed

that he was entitled to return to his Monday-through-Friday shift and did not have to

work rotating weekend shifts as Swedish required him and the other MDTs in his new

department to do. (*Id.* at 127:22-128:10.)  Mr. Manning was "assigned several weekend

shifts, but he failed to show up for them." (Marshall Decl. ¶ 6.)  Mr. Manning contends

that he would have worked the weekend rotating shifts if Swedish had announced that

requirement to him at the time Swedish granted his grievance and offered to reinstate

him. (Manning Dep. at 127:22-128:5.)  In September, Swedish placed Mr. Manning on

paid administrative leave while the parties worked out this issue. (Marshall Decl. ¶¶ 6-7).

Meanwhile, Mr. Manning, Swedish, and the Union agreed to arbitrate the issue of

whether Swedish had made Mr. Manning whole by putting him in a position that

_____

[5] Another displaced MDT, Marcus Collins, emailed Swedish's Chief Human Resources Officer, Rian Brown, to ask clarifying questions about his and Mr. Manning's reinstatement. (*See* MSJ Resp., Ex. J; Brown Decl. ¶¶ 5-6.)  Mr. Manning testified that Mr. Collins was authorized to speak on Mr. Manning's behalf. (Manning Dep. 113:19-15.)

1   included a rotating weekend shift when, prior to his displacement, he had not worked

2   rotating weekend shifts.  (Brown Decl. ¶¶ 18-19.)  The arbitration was scheduled for

3   January 2014.  (*Id.* ¶ 19.)  On November 25, 2013, Swedish removed Mr. Manning from

4   paid administrative leave because the MSC was short on staff, and directed Mr. Manning

5   to return to work on December 2, pending the results of his arbitration.  (*Id.*; *see also*

6   Brown Decl. ¶ 21, Ex. L; Manning Dep. at 141:17-22; Marshall Decl. ¶ 8.)

7        Swedish informed Mr. Manning that he should contact his supervisor "to make

8   any necessary arrangements" for his return, but Mr. Manning did not.  (Brown Decl. ¶ 21,

9   Ex. L; Manning Dep. at 142:4-9.)  However, Mr. Manning reached out the Union because

10  he did not believe that he had to go back to work while his grievance was pending and

11  could continue to remain on paid administrative leave.  (*See* Manning Dep. at 155:11-

12  156:23.)  The Union and the Union's attorney told Mr. Manning that he was required to

13  return to work as Swedish directed until the arbitration resolved the parties' dispute.  (*Id.*)

14  **E.     Termination**

15       Mr. Manning did not show up for work on December 2, 3, and 4 as directed.  (*See,*

16  *e.g.*, Manning Dep. at 151:23.)  He states that he did not return because he "was not

17  updated with the new computer system" and the weekend shift issue was not yet

18  resolved.  (*Id.* at 151:19-152:24.)  On December 6, 2013, Swedish sent Mr. Manning a

19  "no call/no show" letter pursuant to the Dependability Policy.  (Marshall Decl. ¶ 9, Ex.

20  C.)  The letter directed Mr. Manning to call his supervisor, Steve Marshall, with

21  "compelling reasons for" failing to show up at work as required.  (Manning Dep. at

22  149:7-13.)  Mr. Manning did not call Mr. Marshall, but he attempted to speak with Mr.

1  Marshall in person at Swedish's campus.[6]  (Marshall Decl. ¶ 10).  On December 17,

2  2013, Swedish sent Mr. Manning another letter stating that Swedish considered him to

3  have voluntarily resigned from his employment.  (*Id.* at 161:8-22; Marshall Decl. ¶ 11,

4  Ex. D.)  Mr. Manning filed a second grievance.  (Brown Decl. ¶ 24.)

5  **F.    Arbitration**

6          On March 17, 2014, the arbitrator for Mr. Manning's first grievance, Eric B.

7  Lindauer, determined that the CBA required Swedish to offer Mr. Manning and other

8  displaced MDTs open positions for which they were qualified without requiring them to

9  go through an interview process.  (MSJ Resp., Ex. A.; Brown Decl. ¶ 25, Ex. P ("First

10  Arbitration") at SWEDISH000231-SWEDISH000233.)  The arbitrator held that decision

11  in abeyance, however, pending the outcome of the second arbitration to resolve Mr.

12  Manning's grievance about his December 2013 termination.  (First Arbitration at

13  SWEDISH000239.)  On January 23, 2015, Arbitrator Alan Krebs determined that

14  Swedish was justified in terminating Mr. Manning in December 2013 because he had no

15  right to refuse to work while his initial grievance was being resolved.  (Brown Decl.

16  ¶¶ 26, 27, Ex. R ("Second Arbitration") at SWEDISH000420.)  Following the second

17  arbitration in 2015, Arbitrator Lindauer determined that Mr. Manning was not entitled to

18  the "make whole remedy" because Swedish had properly terminated Mr. Manning for his

19  failure to return to work in December 2013.  (Brown Decl. ¶ 28, Ex. S at

20  SWEDISH000562.)

21  _____

22        [6] Mr. Marshall had gone home from work on the day Mr. Manning attempted to speak
with him.  (Marshall Decl. ¶ 10.)

ORDER- 8

1    **G.    Title VII Claims**

2         On June 24, 2013, Mr. Manning filed a charge of discrimination with the Equal

3    Employment Opportunity Commission ("EEOC").  (Brown Decl. ¶ 29, Ex. T ("EEOC

4    Charge").)  Mr. Manning alleged that he had experienced discrimination based on race

5    and retaliation.  (EEOC Charge at 1.)  He further alleged that he had "protested

6    employment discrimination" and stated that "[o]ther non-African American employees

7    whose positions have been reclassified and have not met the requirements of the new

8    classification have been reassigned to vacant positions without delay and were not

9    required to apply for the positions."  (*Id.*)  He also alleged that "several Caucasian

10   [MDTs] formerly under the Surgical Department were given alternate titles and were not

11   required to take a central service test to maintain their employment."  (*Id.*)  The EEOC

12   closed its file on Mr. Manning's charge because the EEOC was "unable to conclude that

13   the information obtained establishes violations of [Title VII]."  (Brown Decl. ¶ 30, Ex. U

14   ("EEOC Dismissal") at 1.)  At that time, the EEOC also notified Mr. Manning of his right

15   to sue within 90 days.  (*Id.*)

16        Based on the employment history detailed above, Mr. Manning brought suit

17   against Swedish on June 15, 2015.[7]  (*See* IFP Mot.)  Mr. Manning alleges that Swedish

18   intentionally discriminated against him on the basis of his race "in violation of the Title

19

20   _____

21        [7] At the time he filed his complaint, Mr. Manning also named several other individuals
     and the Union as defendants.  (*See id.*)  The court dismissed the other defendants on July 9, 2015.
22   (7/9/15 Order (Dkt. # 5).)

ORDER- 9

VII of the Civil Rights Act for harassment, disparate treatment, wrongful termination[,] and retaliation."  (Compl. ¶ 5.1.)

### III.   ANALYSIS

**A.   Swedish's Motion for Summary Judgment**

    1.  <u>Legal Standard</u>

       Summary judgment is appropriate if the evidence, when viewed in the light most favorable to the non-moving party, demonstrates "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Galen v. Cty. of L.A.*, 477 F.3d 652, 658 (9th Cir. 2007);  *Scott v. Harris*, 550 U.S. 372, 378 (2007).  The moving party bears the initial burden of showing there is no genuine issue of material fact and that he is entitled to prevail as a matter of law, and can do so simply by showing that there is no evidence to support the non-moving party's claims.  *Celotex*, 477 U.S. at 323, 325.  If the moving party meets his burden, the non-moving party "must make a showing sufficient to establish a genuine dispute of material fact regarding the existence of the essential elements of his case that he must prove at trial."  *Galen*, 477 F.3d at 658.  The court may take as "undisputed for purposes of the motion" any fact not properly contested or supported.  Fed. R. Civ. P. 56(e)(2).

       Courts generally use a burden shifting approach to evaluate Title VII claims at the summary judgment stage.  *Cornwell v. Electra Cent. Credit Union*, 439 F.3d 1018, 1028 (9th Cir. 2006) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)); *see also McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1124 (9th Cir. 2004) (noting that a

1   plaintiff may also demonstrate retaliation using the burden-shifting approach). This

2   framework requires the plaintiff to first establish a prima facie case of discrimination. *Id.*

3   If the plaintiff succeeds in making out a prima facie case, a presumption of discrimination

4   arises, and the burden shifts to the defendant to articulate a legitimate non-discriminatory

5   reason ("LNR") for the challenged action. *Id.* Once the defendant comes forward with

6   an LNR, the presumption of discrimination disappears and "the plaintiff may defeat

7   summary judgment by satisfying the usual standard of proof required in civil cases under

8   Fed. R. Civ. P. 56(c)." *Id.* At this final stage, the plaintiff must come forward with

9   enough evidence for a reasonable jury to conclude by a preponderance of the evidence

10   that "the defendant undertook the challenged employment action because of the

11   plaintiff's race." *Id.*

12        The plaintiff "may simply produce direct or circumstantial evidence demonstrating

13   that a discriminatory reason more likely than not motivated" the employer, *McGinest*,

14   360 F.3d at 1122, or "offer evidence that the employer's explanation is unworthy of

15   credence"—that is, that the employer's explanation is merely "a pretext for racial

16   discrimination," *Cornwell*, 439 F.3d at 1028 (internal quotations omitted).

17   "Circumstantial evidence of pretext must be specific and substantial in order to survive

18   summary judgment." *Bergene v. Salt River Project Agric. Improvement and Power Dist.*,

19   272 F.3d 1136, 1142 (9th Cir. 2001).

20   //

21   //

22   //

ORDER- 11

2.  <u>Swedish is Entitled to Summary Judgment on All of Mr. Manning's Title VII Claims</u>

Because Mr. Manning has filed his case *pro se*, the court must liberally construe his filings.  *See Balisteri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990). Accordingly, the court determines that Mr. Manning asserts the following claims:  (1) hostile work environment based on racial harassment; (2) disparate treatment on the basis of his race for Swedish's failure to re-hire Mr. Manning when he was displaced after failing to obtain the sterile processing certification; (3) disparate treatment on the basis of his race for Swedish's termination of Mr. Manning; and (4) retaliation on the basis of his race.  (*See generally* Compl.; *see also* MSJ Resp. at 11-12.)  As set forth below, Mr. Manning has failed to demonstrate a genuine issue of material fact on any of these claims, and Swedish is entitled to judgment as a matter of law.

a.  *Hostile Work Environment Based on Racial Harassment*

In determining whether a work environment "is so hostile as to violate Title VII, [the court] consider[s] whether, in light of all the circumstances, the harassment is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."  *McGinest*, 360 F.3d at 1112-13 (internal quotations and citations omitted).  To establish a prima facie case of race discrimination based on a hostile work environment, a plaintiff must show that (1) he was "subjected to verbal or physical conduct because of his race," (2) "the conduct was unwelcome," and (3) "the conduct was sufficiently severe or pervasive to alter the conditions of [his] employment and create an abusive work environment."  *Manatt v. Bank of Am., N.A.*, 339

F.3d 792, 798 (9th Cir. 2003).  A plaintiff must show that the work environment was both subjectively and objectively hostile.  *McGinest*, 360 F.3d at 1113.  In evaluating whether the work environment was objectively hostile, the court considers factors such as the "frequency of discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."  *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993). The court assesses whether the work environment was objectively hostile by considering whether a reasonable person who belongs to the plaintiff's racial group would find the workplace racially hostile.  *McGinest*, 360 F.3d at 1115.

Swedish argues that Mr. Manning's hostile work environment claim fails because there is "no evidence that [Mr.] Manning was subjected to any unwelcome, severe[,] or pervasive race-based conduct."  (MSJ at 25.)  Swedish points to Mr. Manning's deposition, during which Mr. Manning admitted that no one at Swedish made any negative or disparaging comments to Mr. Manning about his race while he worked there. (Manning Dep. at 173:18-20.)  Mr. Manning further admitted that no one harassed him on the basis of his race while he worked at Swedish (*id.* at 174:3-5) and that he never raised a complaint with Swedish about discrimination or harassment (*id.* at 178:10-17).

In response, Mr. Manning argues that he was harassed on the basis of race because he was "subjected to physical conduct directed at him because of his race, the conduct was unwelcomed as presented by multiple email[] threads, the conduct altered the condition of [Mr. Manning] subjecting him to work in a hostile environment as stated by Steve Marshall, Department Manager, in his numerous emails and finally ended to

termination of [Mr. Manning's] employment." (MSJ Resp. at 12.)  While it is undisputed that Mr. Manning was ultimately terminated (*see generally* MSJ; MSJ Resp.), Mr. Manning has not identified or provided any evidence of any "physical conduct" or any other conduct that he endured because of his race. (*See generally* MSJ Resp.)

In addition, the emails that Mr. Manning references, even when viewed in the light most favorable to Mr. Manning, do not refer to a hostile work environment because of his race. (*See* MSJ Resp., Exs. L, N.)  For example, Mr. Marshall states that having Mr. Manning and a fellow displaced co-worker "work in the department without a resolution to their grievance, and trying to hold them accountable to the department schedule is doing little more [than] creating a hostile work environment." (*Id.*, Ex. L.)  The emails refer to Mr. Manning continuing to work at Swedish pending the outcome of his grievance and contain no reference to any racial harassment. (*See id.*)

Swedish has met its burden on summary judgment by showing that there is no evidence to support Mr. Manning's claims. *See Celotex*, 477 U.S. at 325.  Accordingly, Mr. Manning's hostile work environment claim fails as a matter of law.

### b. Disparate Treatment

"Under Title VII, an individual suffers disparate treatment when he or she is singled out and treated less favorably than others similarly situated on account of race." *McGinest*, 360 F.3d at 1121; *see also Cornwell*, 439 F.3d at 1028.  To raise an inference of disparate treatment, the plaintiff must point to either (a) one or more valid comparators or (b) other circumstances surrounding the adverse action that create an inference of discrimination. *See Peterson v. Hewlett-Packard Co.*, 358 F.3d 599, 604-05 (9th Cir.

2004).  Valid comparators must be similar to the plaintiff "in all material respects." *Moran v. Selig*, 447 F.3d 748, 755 (9th Cir. 2006) (citing *McGuinness v. Lincoln Hall*, 263 F.3d 49, 53-54 (2d Cir. 2001)).  Although material characteristics vary from case to case, the Ninth Circuit looks to factors such as whether the proposed comparator and the plaintiff were subject to the same policies, worked at the same jobs, committed similar violations, and had similar disciplinary records.  *See, e.g.*, *Vasquez v. Cty. of L.A.*, 349 F.3d 634, 641 (9th Cir. 2010) (similar jobs and similar type and severity of misconduct); *Wall v. Nat'l R.R. Passenger Corp.*, 718 F.2d 906, 909 (9th Cir. 1983) (similar conduct and disciplinary records).  Mr. Manning contends that he was treated differently because of his race when Swedish declined to re-hire him after displacement from his MDT position and terminated him.[8]  (*See generally* Compl; MSJ Resp.)

                i.    Failure-to-Hire

To establish a prima facie case of disparate treatment for a failure-to-hire claim, Mr. Manning must show that (1) he belongs to a protected class; (2) he applied for a job for which he was qualified and Swedish was seeking applicants; (3) he was rejected for the job; and (4) the job remained open after he was rejected and Swedish continued to seek applicants with the same qualifications as Mr. Manning.  *McDonnell Douglas*, 411 U.S. at 802.

---

[8] Mr. Manning also appears to argue that he was unfairly disciplined between 2009 and 2011 for violating Swedish's Dependability Policy.  (MSJ Resp. at 3-4.)  Mr. Manning has not exhausted his administrative remedies with respect to this allegation.  *See* 42 U.S.C. § 2000e-5(e)(1); (EEOC Charge).  Therefore, the court does not consider this theory of disparate treatment.

1    For the purposes of this motion, Swedish does not contest that Mr. Manning

2    establishes a prima facie case on this claim.  (MSJ at 19.)  The court therefore analyzes

3    whether Swedish had an LNR for deciding not to hire Mr. Manning.  "To [articulate an

4    LNR], the defendant must clearly set forth, through the introduction of admissible

5    evidence, the reasons for the plaintiff's rejection."  *Lyons v. England*, 307 F.3d 1092,

6    1112 (9th Cir. 2002).  Swedish argues that it did not hire Mr. Manning because he

7    misrepresented his work experience, contradicted himself during his interview,

8    demonstrated a lack of motivation, and was outperformed by other interviewees during a

9    uniform panel interview.  (Marshall Decl. ¶ 4; Supp. Marshall Decl. (Dkt. # 48) ¶ 3; MSJ

10    Resp., Ex. U (describing Swedish's rationale for not hiring Mr. Manning).)  Mr. Manning

11    also admits that he had not performed some of the tasks he listed on his resume and that

12    he had not worked in the warehouse as represented on his resume.  (Manning Dep. 18:13-

13    15, 33:19-35:14.)  Therefore, the court finds that Swedish had an LNR for not hiring Mr.

14    Manning.  *See Lyons*, 307 F.3d at 1112; *Cornwell*, 439 F.3d at 1034.

15    Because Swedish has demonstrated an LNR, the burden shifts to Mr. Manning to

16    present evidence demonstrating that Swedish's LNR is mere pretext for racial

17    discrimination, which he must do with specific and substantial evidence.  *See Bergene*,

18    272 F.3d at 1142.  Mr. Manning attempts to establish pretext by arguing that Swedish's

19    reasons for not hiring him are "untrue" and "false."  (MSJ Resp. at 2, 4, 12, Ex. A.)  In

20    addition, Mr. Manning, citing the arbitrator's decision that he should have been placed

21    into an open position without an interview following his displacement, argues that he was

22    "qualified for the job" he applied for and that Swedish's reason for failing to hire him "is

1    factually untrue, which supports [Mr. Manning's] claim for pretext for discrimination."

2    (MSJ Resp. at 2.)

3           However, Mr. Manning fails to present any specific and substantial evidence from

4    which racial discrimination could be inferred.  (*See generally id.*)  The exhibit Mr.

5    Manning offers to support pretext includes only Swedish's explanation for why it decided

6    not to hire him—the same reasons Swedish has argued in its motion for summary

7    judgment.  (*Compare id.* at 12, Ex. U *with* Marshall Decl. ¶ 4.)  In addition, Swedish's

8    violation of the CBA by does not alone constitute specific and substantial evidence of

9    pretext for racial discrimination (*cf.* MSJ Resp. at 2-3), especially because Swedish hired

10   a racially diverse group for the open positions.  (Marshall Decl. ¶ 4 (noting that Swedish

11   hired one person who identified as African American, one who identified as

12   Hawaiian/Pacific Islander, one who identified as "two or more races," and another who

13   identified as "white.")  Therefore, Mr. Manning has not offered specific and substantial

14   evidence to demonstrate that Swedish's LNR was merely pretext for racial

15   discrimination, and his failure-to-hire disparate impact claim fails as a matter of law.

16                          ii.   Wrongful Termination

17          To establish a prima facie case of wrongful termination under Title VII, Mr.

18   Manning must show that (1) he belongs to a protected class; (2) he performed his job

19   satisfactorily and met Swedish's legitimate expectations; (3) he suffered an adverse

20   employment action; and (4) Swedish treated him differently from a similarly situated

21   employee who does not belong to the same protected class.  *McDaniels v. Grp. Health*

22   *Co-op*, 57 F. Supp. 3d 1300, 1310 (W.D. Wash. 2014).  Swedish argues that this claim

1  fails because Mr. Manning cannot establish the second and fourth elements of his prima

2  facie case.  (MSJ at 22-23; MSJ Reply (Dkt. # 42) at 9.)  The court agrees.

3       Swedish contends that Mr. Manning was not performing his job satisfactorily

4  when he was terminated.  Swedish required Mr. Manning to return to work in December

5  2013, but Mr. Manning did not return as directed.  (*See* Manning Dep. at 151:19-152:24.)

6  By not showing up for three consecutive shifts, Mr. Manning violated Swedish's

7  Dependability Policy, for which he was terminated.  (*Id.*; Marshall Decl. ¶ 9 Ex. C.)  Mr.

8  Manning does not dispute that he failed to come to work or that one of Swedish's

9  legitimate expectations was that he comply with Swedish's Dependability Policy.  (*See*

10 Manning Dep. at 151:19-152:24.)  Therefore, the uncontroverted evidence demonstrates

11 that Mr. Manning was not performing his job satisfactorily when he was terminated.  (*See*

12 *generally* Resp.)

13      Swedish also argues that there is no evidence that Swedish treated Mr. Manning

14 differently than similarly situated employees who did not belong to his protected class.

15 (MSJ at 22; MSJ Reply at 6-7, 9.)  Specifically, Swedish argues that it "consistently

16 enforced the 'no call/no show' provision in the Dependability Policy," and terminated

17 "approximately" 13 employees from diverse racial backgrounds under the Policy in 2013.

18 (MSJ at 22 (citing Brown Decl. ¶ 9).)

19      In response to Swedish's argument that there is no genuine dispute of material fact

20 on this issue, Mr. Manning suggests that Swedish treated him differently in two ways:

21 (1) by providing him with daytime, rather than evening, preparation classes prior to his

22 displacement, and (2) by not calling him before terminating him under the Dependability

1   Policy. (MSJ Resp. at 4-5, 11.) Mr. Manning contends the preparation courses were

2   offered during the day and that he was not able to attend those courses because he worked

3   the night shift and had "prior commitments" during the day. (*Id.* at 5.) To support this

4   claim of discrimination, Mr. Manning provides the races of his fellow MDTs (*see* MSJ

5   Resp. Ex. F), but the information alone does not suggest that providing Mr. Manning with

6   the daytime courses amounted to disparate treatment because of his race. He also fails to

7   present evidence that he and the other employees were similar in all other material

8   respects. (*See generally id.*); *Moran*, 447 F.3d at 755 (stating that comparators must be

9   similar to the plaintiff in "all material respects").

10      In addition, Mr. Manning asserts that Swedish "did not follow its own policy of

11  attempting to call [Mr. Manning] when he did not show up to work as scheduled." (MSJ

12  Resp. at 11.) To support his argument, Mr. Manning provides several examples of

13  employees who were terminated for violating Swedish's Dependability Policy. (MSJ

14  Resp., Ex. T). Mr. Manning contends those employees were "all . . . contacted by their

15  superiors" prior to being terminated under the "no call/no show policy." (MSJ Resp. at

16  11.) Even if Swedish did not call Mr. Manning prior to his termination,[9] Mr. Manning

17  nonetheless fails to show that Swedish treated him differently because of his race. Mr.

18  Manning does not provide the races of the other employees terminated under the policy

19

_____

20      [9] Mr. Manning provides no evidence to support his argument that he was not called

21  before Swedish terminated him under the "no call/no show" policy. (*See generally* MSJ Resp.)
    However, Swedish presents evidence that it gave Mr. Manning an opportunity to explain his

22  absences when it directed him to contact Mr. Marshall with compelling reasons for his absence.
    (*See* Marshall Decl. ¶ 9, Ex. C.)

1   or other information about how they may have been similarly situated to him.  (*See* MSJ

2   Resp. Ex. T (including termination letters, which reference calls to the employees prior to

3   their termination, for employees who were terminated for failing to comply with the

4   Dependability Policy).)  There is no evidence before the court to support that Swedish

5   treated Mr. Manning differently from other employees because of his race.  Accordingly,

6   this claim fails as a matter of law.

7           *c.  Retaliation*

8        Title VII prohibits an employer from retaliating against an employee for opposing

9   racial discrimination.  42 U.S.C. § 2000e-3(a).  To show a prima facie case of retaliation,

10   Mr. Manning must show (1) that he acted to protect his Title VII rights; (2) that an

11   adverse employment action was taken against him; and (3) that there was a causal link

12   between the two.  *Id.*; *see also Cornwell*, 439 F.3d at 1035.  The required causal link

13   "may be inferred from . . . the proximity in time between the protected action and the

14   allegedly retaliatory employment decision."  *Cornwell*, 439 F.3d at 1035 (internal

15   quotation omitted).  Swedish argues that there is no evidence to support the required

16   causal link.  (*See* MSJ at 26-27.)

17        After Mr. Manning was displaced in January 2013, he filed an EEOC charge on

18   June 24, 2013, to protect his Title VII rights.  (*See* EEOC Charge); 42 U.S.C. § 2000e-

19   3(a).  Several months later, in December 2013, Swedish terminated Mr. Manning—after

20   granting the earlier grievance—for his failure to comply with the Dependability Policy.

21   The court concludes that no evidence in the record demonstrates a causal link between

22   the two events.

1    In July 2013, about a month after Mr. Manning filed the EEOC charge, Swedish

2    offered to settle Mr. Manning's grievance and reinstate him.  (Brown Decl. ¶ 14.)  Mr.

3    Manning attempts to create a dispute of fact by pointing out that Donna Moberly, who

4    worked in Human Resources for Swedish, offered to reinstate Mr. Manning's position on

5    July 10, 2013, "about 14 days after [Mr. Manning] filed the EEOC and NLRB charges,

6    stating that the reinstatement is conditional to Plaintiff's withdrawal of the NLRB charge

7    and withdrawal of the EEOC charge."  (MSJ Resp. at 12.)  However, this evidence

8    demonstrates that Swedish acted favorably toward Mr. Manning shortly after he filed the

9    EEOC charge.

10    Further, as discussed above, the uncontroverted evidence shows that Swedish

11    terminated Mr. Manning in December 2013 for violating the Dependability Policy.  *See*

12    *supra* § III.A.2.b.ii.  Swedish therefore terminated Mr. Manning for reasons unrelated to

13    the EEOC Charge, and, even viewing the facts in the light most favorable to Mr.

14    Manning, the court has no reason to infer retaliation.  For these reasons, Mr. Manning's

15    retaliation claim also fails as a matter of law.

16    **B.    Mr. Manning's Motion to Amend**

17        1.    Legal Standard

18    Federal Rule of Civil Procedure 15(a)(2) states that the court should "freely give"

19    leave to amend a pleading  "when justice so requires," Fed. R. Civ. P. 15(a)(2); *see also*

20    *Sharkey v. O'Neal*, 778 F.3d 767, 774 (9th Cir. 2015) (noting that a court should be

21    "cautious" in its "decision to deny pro se litigants leave to amend"), but a court may deny

22    leave to amend where the proposed amendment is futile, *see Miller v. Rykoff-Sexton, Inc.*,

1    845 F.2d 209, 214 (9th Cir. 1988).  Amendment of a complaint is futile if the court would

2    not have subject matter jurisdiction over the new claims in the proposed amendment.  *See*

3    *Am. W. Airlines, Inc. v. GPA Grp., Ltd.*, 877 F.2d 793, 801 (9th Cir. 1989) (holding that

4    district court properly determined amendment was futile because allegations failed to

5    establish jurisdiction); *Gonzalez v. United States*, CV 12-00375-TUC-JGZ, 2013 WL

6    308762, at *9 (D. Ariz. Jan. 25, 2013) ("Because the Court concludes that it lacks subject

7    matter jurisdiction, the Court finds that leave to amend would be futile.").

8            2.    Amendment of Mr. Manning's Complaint Would Be Futile

9            Mr. Manning seeks to amend his complaint to add a state law breach of contract

10   claim.[10]  (*See* Mot. to Amend at 1.)  Specifically, Mr. Manning seeks to allege that

11   Swedish breached a "written contract concerning [the] Employment Security

12   Department's reimbursement of [unemployment] benefits."  (*Id.* ¶ 5.2.)  Mr. Manning

13   asserts that this court has supplemental subject matter jurisdiction over his proposed

14   breach of contract claim.[11]  (*See id.* at 1 ("This cause of action arose out of transactions

15   _____

16        [10] Mr. Manning filed his proposed amended complaint on July 27, 2016 (*see* Mot. to

17   Amend), which was the deadline for moving to amend pleadings pursuant to the court's October
     29, 2015, scheduling order (Sched. Order (Dkt. # 25)).  In light of Mr. Manning's *pro se* status
     and because his proposed amended complaint states that Mr. Manning "requests the court to

18   join" a state law breach of contract claim (Mot. to Amend at 1), the court construed Mr.
     Manning's filing as a motion to amend (7/28/16 Order (Dkt. # 32)).

19        [11] Mr. Manning's original complaint, in which he alleges various violations of Title VII,

20   is based on federal question jurisdiction.  (*See generally* Compl.)  Mr. Manning alleges in his
     proposed amended complaint that the court has diversity jurisdiction over his breach of contract

21   claim because of the "diversity of the defendant, Rian Brown, employee of Providence
     Health&Services based in Portland, Oregon and that the damages, exclusive of interest and cost,
     are in excess of fifty thousand dollars." (Mot. to Amend ¶ 2.1.)  The court dismissed Mr. Brown

22   from this action on July 9, 2015, (7/9/15 Order), and Mr. Manning does not purport to join Mr.

1  connected with the same subject matter.").)  Mr. Manning does not otherwise seek to

2  substantively amend his factual allegations or add any additional federal claims.

3  (*Compare* Compl. *with* Mot. to Amend.)  Swedish argues that Mr. Manning's motion to

4  amend should be denied because Mr. Manning has "unduly and inexplicably delayed" in

5  bringing his breach of contract claim, the new claim would prejudice Swedish, the

6  amendment is futile because Mr. Manning and Swedish never entered into a contract, and

7  the court lacks subject matter jurisdiction.  (*See* Resp. to Mot. to Amend. (Dkt. # 38) at 2-

8  3, 5-13.)

9       The court's only basis for subject matter jurisdiction over Mr. Manning's breach

10  of contract claim would be supplemental jurisdiction.  *See* 28 U.S.C. § 1367; *supra* n.11.

11  Even if Mr. Manning satisfies the factors required for leave to amend his complaint and

12  his breach of contract claim arises from the same common nucleus of operative fact as his

13  Title VII claims, the court declines to exercise supplemental jurisdiction in the absence of

14  Mr. Manning's Title VII claims, which the court has already dismissed with prejudice.[12]

15       The supplemental jurisdiction statute provides that when the district court has

16

17  Brown as a defendant in the proposed amended complaint, despite this allegation (*see* Mot. to
   Amend).  However, even if Mr. Brown were a party to Mr. Manning's proposed complaint, there

18  would not be complete diversity between Mr. Manning and all of the defendants.  *See Lincoln
   Prop. Co. v. Roche*, 546 U.S. 81, 89 (2005).  In addition, Mr. Manning has not alleged damages

19  in excess of $75,000.00 as required for diversity jurisdiction. (*See* Mot. to Amend ¶ 2.1 (alleging
   damages in excess of $50,000.00)); 28 U.S.C. § 1332(a).  Accordingly, Mr. Manning's proposed

20  amendment complaint does not establish diversity jurisdiction.

21       [12] Because the court declines to exercise supplemental jurisdiction over Mr. Manning's
   breach of contract claim, the court does not address the Rule 15 factors for amendment or decide

22  whether Mr. Manning's proposed breach of contract claim arises from a common nucleus of
   operative fact with his Title VII claims.

1    original jurisdiction over a civil action, it will have supplemental jurisdiction "over all

2    other claims that are so related to claims in the action within such original jurisdiction

3    that they form part of the same case or controversy under Article III of the United States

4    Constitution."  28 U.S.C. § 1367(a).  "A state law claim is part of the same case or

5    controversy when it shares a 'common nucleus of operative fact' with the federal claims

6    and the state and federal claims would normally be tried together."  *Bahrampour v.*

7    *Lampert*, 356 F.3d 969, 978 (9th Cir. 2004) (internal citation omitted).

8         However, a district court may in its discretion decline to exercise supplemental

9    jurisdiction over a claim if the district court has dismissed all claims over which it has

10   original jurisdiction.  28 U.S.C. § 1367(c)(3); *Foster v. Wilson*, 504 F.3d 1046, 1051 (9th

11   Cir. 2007).  Indeed, "[t]here is a strong preference in the Ninth Circuit for declining to

12   exercise supplemental jurisdiction once the federal claim is dismissed."  *Wallace v. Smith*

13   *& Smith Constr., Inc.*, 65 F. Supp. 2d 1121, 1123 (D. Or. 1999) (citing *Danner v.*

14   *Himmelfarb*, 858 F.2d 515, 523 (9th Cir. 1988)) (declining to exercise supplemental

15   jurisdiction over state law claims after dismissing the plaintiff's Title VII claims); *see*

16   *also Acri v. Varian Assocs., Inc.*, 114 F.3d 999, 1001 (9th Cir. 1997) (en banc) (quoting

17   *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988)) ("[I]n the usual case in

18   which all federal-law claims are eliminated before trial, the balance of factors . . . will

19   point toward declining to exercise jurisdiction over the remaining state-law claims.");

20   *Montero v. AGCO Corp.*, 19 F. Supp. 2d 1143 (E.D. Cal. 1998) (same).  Discretion to

21   decline the exercise of supplemental jurisdiction over state law claims is informed by

22   "values of economy, convenience, fairness, and comity."  *Acri*, 114 F.3d at 1001.

1    Consistent with the Ninth Circuit's "strong preference" for declining supplemental

2    jurisdiction in the absence of federal claims, *see Wallace*, 65 F. Supp. 2d at 1123, the

3    court concludes that amending Mr. Manning's complaint to add the breach of contract

4    claim is futile because the court would decline to exercise supplemental jurisdiction over

5    that claim now that Mr. Manning's Title VII claims have been dismissed on summary

6    judgment, *see* 28 U.S.C. § 1367(c)(3).  In addition, Mr. Manning has identified no undue

7    inconvenience or prejudice that he will suffer if he is left to pursue his state law claims in

8    state court.  (*See generally* Mot. to Amend; Mot. to Amend Reply (Dkt. # 41).)

9        Accordingly, the court denies Mr. Manning's motion to amend.

10                        **IV.    CONCLUSION**

11       For the foregoing reasons, the court GRANTS Swedish's motion for summary

12   judgment (Dkt. # 33), DISMISSES Mr. Manning's complaint with prejudice, and

13   DENIES Mr. Manning's motion to amend his complaint (Dkt. # 31).

14       Dated this 30th day of September, 2016.

15

16

17

     JAMES L. ROBART
18   United States District Judge

19

20

21

22

ORDER- 25